In re Alan J. SAUNDERS and Della
C. Randall-Saunders, Debtors.

Bankruptcy No. 96-16009-WCH.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 1, 1997.

Carolyn A. Bankowski, Curran, Coffey & Tavenner, L.L.P., Boston, MA, for Debtors.

Janis C. Kestenbaum, U.S. Dept. of Justice, Washington, DC, Susan Poswistilo, Assistant U.S. Attorney, Boston, MA, for United States.

Richard Askenase, Boston, MA, Chapter 13 Trustee.

---

## DECISION ON MOTION OF THE UNITED STATES FOR RECONSIDERATION

WILLIAM C. HILLMAN, Bankruptcy Judge.

This matter originally came before me on the Chapter 13 Trustee's (the "Trustee's") motion to dismiss the Chapter 13 petition of Alan J. Saunders and Della C. Randall–Saunders (the "Debtors"). The determinative issue was whether Debtors may tithe to their church as proposed in their Chapter 13 plan. I answered the question in the negative. The United States of America has filed a motion for reconsideration of that decision. I deny the motion for reconsideration for the reasons stated below.

### 1. Background and Procedural History

The plan provided for a 10% dividend to unsecured creditors, payable over 48 months in installments of $215 per month. The Debtors' Schedule J indicates a monthly expense of $400 for charitable contributions, which the Debtors regard as a tithe to their church "mandated by Scripture", although tithing is not part of the doctrine of their church.

The Trustee moved to dismiss on the grounds that tithing is not reasonably necessary for the Debtor's maintenance and support, 11 U.S.C. § 1325(b), and argued that, to the extent the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA") mandated a different result, I should hold RFRA to be unconstitutional. The Debtors relied primarily but not exclusively on RFRA to support their opposition to the trustee's motion.

The United States intervened in order to defend the constitutionality of RFRA and moved to stay consideration of the matter pending a decision of the United States Supreme Court in a case which was seemingly directly in point and in which certiorari had been granted. I granted the motion to stay.

Subsequently, the Supreme Court held RFRA to be unconstitutional, as is discussed in more detail below. City of Boerne v. Flores, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). I annulled the stay and excused the United States from further participation "as 'the constitutional issue has been resolved." In re Saunders, 214 B.R. 524, 526 (Bankr.D.Mass.1997) ("Saunders I"). Since the Debtors had also asserted their right to tithe without regard to RFRA, I considered the motion to dismiss in light of the pre-RFRA case law, Saunders I, at 526, and held that tithing is not a reasonable expense for the maintenance or support of a debtor for purposes of 11 U.S.C. § 1325(b)(2), relying in large part on Justice Stevens' concurring opinion in Flores:

> If the historic landmark on the hill in Boerne happened
>
>> to be a museum or an art gallery owned by an atheist, it would not be eligible for an exemption from the city ordinances that forbid an enlargement of the structure. Because the landmark is owned by the Catholic Church, it is claimed that RFRA gives its owner a federal statutory entitlement to an exemption from a generally applicable, neutral civil law. Whether the Church would actually prevail under the statute or not, the statute has provided the Church with a legal weapon that no atheist or agnostic can obtain. This government preference for religion, as opposed to irreligion, is forbidden by the First Amendment.

—— U.S. at ——, 117 S.Ct. at 2172.

I issued an order sustaining the objection and authorizing the Debtors to file an

amended plan within thirty days. *Saunders I,* at 527.

The United States moved for reconsideration. It argued that "the Supreme Court struck down RFRA only as it applies to the states and that the statute continues to apply to the federal government and to federal law such as the Bankruptcy Code." *United States' Memorandum of Law in Support of Its Motion for Reconsideration* at 2 (*"US Memo I"*).

Because the United States raises an important issue of law which is not fully treated in *Saunders I,* I find that the motion satisfies the threshold test for a motion for reconsideration set forth in *In re Wedgestone Financial,* 142 B.R. 7 (Bankr.D.Mass.1992) and I will respond to the arguments advanced by the United States.[1]

### 2. On the Merits

#### a. Reasonable necessity

■ "Reasonably necessary" is not defined in the Bankruptcy Code. The initial inquiry is whether tithing is appropriate as a reasonably necessary expense under § 1325(b) without regard to RFRA. Only if it is not must I then consider whether the right to tithe is protected in Chapter 13 by RFRA or otherwise.

Chapter 13 places an extraordinary burden upon the court when an objection is filed to a proposed plan:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of

such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b).

■ The Debtors propose to pay $215 per month to their unsecured creditors for each of the 48 months of their plan to achieve a 10% dividend or a total payment to creditors of $10,320. In addition, they contemplate $400 per month as tithing. If the amount sought to be dedicated to tithing were added to the proposed payment to creditors, $615 per month would be available, amounting to a dividend of almost 29%, rather than 10%. Even if the Debtors' plan ran for only 36 months, a payment of $615 per month would yield $22,140 to creditors, more than double the amount proposed to be paid under the plan. The unsecured creditors are receiving less than they would if the Debtors were not charitably minded; this is a direct loss to them.[2] Sheridan's line "Be just before you're generous",[3] remains true. I agree with those courts which hold that there is no general right to make contributions to charitable entities, secular or religious, in determining reasonable necessity.[4]

1. The trustee filed a memorandum in opposition to the motion for reconsideration. The Debtors did not brief any of the issues now before me.

2. *See* Daniel Keating, *Bankruptcy, Tithing, and the Pocket–Picking Paradigm of Free Exercise,* 1996 Ill.L.Rev. 1041 ("Keating").

3. Richard Brinsley Sheridan, *The School for Scandal,* Act IV, Scene i (1777). *See, e.g.,* Oliver B. Pollak, *"Be Just Before You're Generous":*

*Tithing and Charitable Contributions in Bankruptcy,* 29 Creighton L.Rev. 528 (1996).

4. *See In re Tessier,* 190 B.R. 396, 403 (Bankr. D.Mont.1995) (charitable contributions, both secular and sectarian, are not a reasonable living expense for the purpose of confirmation of a Chapter 13 plan); *In re Hudson, supra; In re Red,* 60 B.R. 113 (Bankr.E.D.Tenn.1986) (United Way contribution not necessary for debtor's maintenance or support).

To permit a contribution to a religious organization where a secular donation is not permitted is inappropriate. "Absent the most unusual circumstances, one's religion ought not to affect one's legal rights or duties or benefits." *Board of Education v. Grumet,* 512 U.S. 687, 715, 114 S.Ct. 2481, 2497, 129 L.Ed.2d 546 (1994) (O'Connor, J., concurring in part and concurring in the judgment). Notwithstanding authority to the contrary,[5] I stand by my prior ruling that, considered without regard to RFRA, tithing is not a reasonably necessary expense of a Chapter 13 debtor. *Saunders I,* at 527.[6]

### b. RFRA after Flores

The United States argues that the Supreme Court in *Flores* only held RFRA to be unconstitutional as it affects state law. *US Memo I passim.* The majority did indeed strike down RFRA as exceeding Congress' enforcement powers under the Fourteenth Amendment,[7] and only Justice Stevens, in his concurrence quoted above, invoked the Establishment Clause. Since the Fourteenth Amendment is directed at state rather than federal action, the United States is correct in saying that the reasoning of the majority does not support my conclusion. The constitutional issues involved in the application of RFRA to the Bankruptcy Code remain open after *Flores.*

5. *In re McDaniel,* 126 B.R. 782, 784–85 (Bankr. D.Minn.1991) (it would violate First Amendment to hold that tithing was per se not a reasonably necessary expense, but there is no constitutional prohibition of a finding that the proposed level of tithing is excessive); *In re Bien,* 95 B.R. 281 (Bankr.D.Conn.1989) (tithing may be a reasonably necessary expense); *In re Wood,* 92 B.R. 264, 266 (Bankr.S.D.Ohio 1988) (allowing tithe of $43 per month); *In re Navarro,* 83 B.R. 348, 356 (Bankr.E.D.Pa.1988) (some level of religious or charitable contribution may be consistent with expenditures reasonably necessary).

6. *See also In re Miles,* 96 B.R. 348, 350 (Bankr. N.D.Fla.1989) (church contributions may be a source of inner strength and comfort but are not necessary for support or maintenance); *In re Hudson,* 64 B.R. 73, 75 n. 1 (Bankr.N.D.Ohio 1986) (disfavoring contribution of funds to non-profit institutions as not included in § 1325); *In re Sturgeon,* 51 B.R. 82, 83 (Bankr.S.D.Ind.1985) (where church did not require tithing, not a necessary living expense).

### c. The Free Exercise Clause

■ The United States argues primarily that RFRA is constitutional as applied to the Bankruptcy Code because the Bankruptcy Clause of the Constitution of the United States,[8] as augmented by the Necessary and Proper Clause,[9]

"provides Congress the authority to mandate that the bankruptcy system be respectful of religious exercise. As applied to the Bankruptcy Code, that is all RFRA does: it simply amends the Bankruptcy Code to ensure that all bankruptcy laws are implemented in a way that does not substantially burden the exercise of religion, unless doing so would be narrowly tailored to advance a compelling government interest."

*US Memo I at 9.*

The preliminary point—that Congress has authority to augment its bankruptcy powers with legislation that is necessary and proper to that end—is incontestable. The actual issue is whether RFRA does no more than that or goes beyond to violate the Free Exercise Clause or Establishment Clause of the First Amendment.[10]

Under the facts of this case, tithing cannot be protected in Chapter 13.

7. "1. ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
. . . .
5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this Article." U.S. Const., Amend. XIV, Sections 1, 5.

8. "To establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const., Art. I, § 8, cl. 4.

9. "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers...." U.S. Const., Art. I, § 8, cl. 18.

10. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const., Amend. I cl. 1.

A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents.

*Board of Education, supra,* 512 U.S. at 694, 114 S.Ct. at 2487, 129 L.Ed.2d 546 (1994) (citations and internal quotation marks omitted).

Professor Keating makes a strong argument that tithing in Chapter 13 would violate the Free Exercise Clause. Keating, *supra,* at 1044–1050. He looks at the fact patterns of the decided Supreme Court cases and distinguishes tithing from those cases:

The more persuasive point to make for the bankruptcy trustee is that none of the Supreme Court cases that have upheld externality-creating religious conduct has ever involved such a direct infringement on the contractual rights of a private group.

. . . .

One good example of a category of cases in which the Supreme Court has allowed religious conduct to create externalities has been the unemployment compensation cases. . . . There have been other cases in which the Court has allowed an individual's free exercise conduct to invalidate or to be excepted from a government regulation, but the free exercise externalities involved in there other cases have been neither pecuniary nor private: an exception to compulsory school attendance laws as applied to Amish parents who refused on religious grounds to send their children to school; invalidation of a compelled display of a license plate slogan that offended religious reliefs; and invalidation of a compulsory flag salute that offended some religious adherents.

Even though the free exercise argument prevailed in the above-described cases, both unemployment compensation and otherwise, no private contract rights were adversely affected by the plaintiff's free exercise. The cost of accommodating free exercise in those cases was felt, if at all, by the government or by taxpayers as a group. That, however, is a more.attenuated form of wealth transfer and a categorically different form of "pocket-picking" than is created by allowing a debtor's free exercise to diminish the contractual rights of a particular group of private individuals.

*Id.* at 1018–1049 (footnotes omitted).

RFRA, as applied to tithing in Chapter 13, favors religion in general over non-religion. To that extent it violates the Free Exercise Clause and is unconstitutional.[11]

### d. The Establishment Clause

The United States Supreme Court has established a tri-partite test to determine whether statutes comport with the Establishment Clause:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.

*Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citations and internal quotation marks omitted).[12]

### (1) The legislative purpose of RFRA

If there is to be assurance that the Establishment Clause retains its force in guarding against those governmental actions it

---

**11.** The United States also urges me to follow by analogy *Equal Employment Opportunity Commission v. Catholic University,* 83 F.3d 455 (D.C.Cir. 1996), in which the Circuit Court sustained the application of RFRA as applied to the Civil Rights Act of 1964, 42 U.S.C. § 2000e. *US Memo I* at 10–11. However, this argument is deprived of its basic vitality because the court relied for its opinion as to the constitutionality of RFRA on the circuit court opinion in *Flores,* 83 F.3d at 469, which was reversed by the Supreme Court.

**12.** It has been suggested that "the slide away from Lemon's unitary approach is well under way", *Board of Education v. Grumet,* 512 U.S. 687, 715, 114 S.Ct. 2481, 2497, 129 L.Ed.2d 546 (1994) (O'Connor, J., concurring in part and concurring in the judgment), but I find it to be a reasonable tool for analyzing First Amendment issues in the bankruptcy arena. *See passim,* Welton O. Seal, *"Benevolent Neutrality" Toward Religion: Still an Elusive Ideal After Board of Education of Keryas Joel v. Grumet,* 73 N.C.L.Rev. 1641 (1995).

was intended to prohibit, we must in each case inquire first into the purpose and object of the governmental action in question....

*Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 838–39, 115 S.Ct. 2510, 2521, 132 L.Ed.2d 700 (1995).

The purposes of RFRA as stated in the statute are

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b).

The explicit purpose stated is to subject religious activities to a lesser degree of First Amendment scrutiny than would be afforded to rights protected by other clauses of the First Amendment. Whether that purpose deprives RFRA of its "neutrality towards religion", *Rosenberger*, 515 U.S. at 839, 115 S.Ct. at 2521, is a thorny issue which I need not face, as I find other constitutional infirmities in RFRA as applied to Chapter 13 plans under the Bankruptcy Code.

### (2) RFRA's effect on religion

■ The United States contends that Congress may protect religious liberty in the bankruptcy context just as it does in the exercise of its Article I power "to lay and collect taxes." [13] In this regard it relies primarily on the decision of the Supreme Court in *Bob Jones University v. United States*, 461 U.S. 574, 586–92, 103 S.Ct. 2017, 2025–29, 76 L.Ed.2d 157 (1983). *US Memo I* at 10.

In that case the Supreme Court dealt with the denial of a tax exemption to a university which practiced racial discrimination. The United States cites the case for the proposition that "Congress may provide tax-exempt status for religious organizations, as it has done under 26 U.S.C. § 501(c)(3)." *Ibid.*

But the Internal Revenue Code is written with a much broader pen, which belies the argument made by the government. It includes as exempt organizations:

Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

26 U.S.C. § 501(c)(3).

Section 501(c)(3) is itself but one element of a laundry list of organizations which includes entities as diverse as civic leagues; labor, agricultural, and horticultural organizations; clubs organized for pleasure or recreation; fraternal benefit societies and the like; cooperative telephone companies; membership cemetery companies; credit unions; and many others. 26 U.S.C. § 501(c) *passim*. As the Supreme Court explained,

"Congress sought to provide tax benefits to charitable organizations, to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind."

461 U.S. at 588, 103 S.Ct. at 2026.

To use Justice Stevens' example in the context of the Internal Revenue Code, a museum or an art gallery owned by an atheist and operated on a non-profit basis would be entitled to the exemption as would the covered religious organizations.

---

**13.** U.S. Const., Amend. I cl. 1.

I conclude that RFRA, if it authorizes tithing in the context of a Chapter 13 plan, has the primary effect of advancing religion, not as one type of non-profit institution .preferred "when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse", *Rosenberger*, 515 U.S. at 839, 115 S.Ct. at 2521, but solely because it is religion. That effect is impermissible under the Establishment Clause. Neither the state nor the federal government "can constitutionally pass laws or impose requirements which aid all religions as against non-believers." *Torcaso v. Watkins*, 367 U.S. 488, 495, 81 S.Ct. 1680, 1683, 6 L.Ed.2d 982 (1961).

*(3) RFRA and entanglement with religion*

■■■ The United States also relies on *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), which contains a vivid explanation of the problems faced in First Amendment interpretation which it is not necessary to repeat here. The Court upheld against Establishment Clause attack a tax exemption granted

> to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups.

397 U.S. at 673, 90 S.Ct. at 1413.

In so doing the Court enunciated a two-part inquiry. First it must be determined whether the legislative purpose was "aimed at establishing, sponsoring, or supporting religion." A negative answer to that question

> does not end the inquiry, however. We must also be sure that the end result—the effect—is not an excessive government entanglement with religion. The test is inescapably one of degree.... [T]he questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement.

397 U.S. at 674–75, 90 S.Ct. at 1414–15. *See also Lemon, supra*, 403 U.S. at 613–14, 91 S.Ct. at 2111–12.

Applying the second portion of the *Walz* test to the present case illustrates the acute problem a bankruptcy court faces in this regard. The court must determine the extent to which tithing is "reasonably necessary" for the maintenance and support of the debtor. This places the judge in what has been described with a high degree of understatement as "having to pass judgment on a debtor's lifestyle". *In re Andrade*, 213 B.R. 765, 768 (Bankr.C.D.Cal.1997). Considering that Chapter 13 plans are frequently modified as a result of claims litigation, changes of circumstances, etc., the judge may have to rule repeatedly as to the permissible amount of tithing.

It has been suggested that the court has an even heavier burden, that it must examine the legitimacy of the religious recipient, *In re Packham*, 126 B.R. 603, 609 (Bankr.D.Utah 1991), and also study the tenets of a debtor's religion and determine the sincerity with which he or she believes that tithing is mandated. Keating, *supra*, at 1056–1057.

The application of RFRA to Chapter 13 plans with the effect of permitting tithing imposes a necessity for "continuing surveillance leading to an impermissible degree of entanglement" into the mind and soul of a debtor. I reject the cases which hold that tithing is a protected First Amendment activity[14] and should be granted particular protection. I find that, if RFRA directs me to permit tithing in a Chapter 13 plan, it most excessively entangles me with religion and is unconstitutional.

*3. Conclusion*

Having reconsidered my prior. decision, I reaffirm it and hold that debtors seeking the protection of Chapter 13 of Title 11 cannot include tithing as part of the "reasonably necessary" expenses permitted as a deduction from disposable income. While this is a harsh result, I find myself compelled to it by the mandate of the Constitution.[15]

---

**14.** *See, e.g., In re McDaniel, supra.*

**15.** *See* Note, *Tithing in Chapter 13—A Divine Creditor Exception to Section 1325?*, 110 Harv.

] An order will issue denying the motion for reconsideration and authorizing the Debtors to file an amended plan consistent with this decision within thirty days.[16]

L.Rev. 1125, 1141 (1997), quoted in *Saunders I*, at 527.

**16.** While not applicable on the facts of this case, there remains a light at the end of the tunnel for many debtors who wish to combine Chapter 13 and tithing or other charitable giving. "If a tithing debtor in Chapter 13 were willing to propose a five-year repayment plan with tithing that gave unsecured creditors to same present-value return as a three-year plan *without* tithing,

then unsecured creditors should not be able to complain about the tithing. Because Chapter 13 debtors are not required to propose plans longer than three years, the unsecured creditors' baseline entitlement should be measured as what they would receive in a three-year, no-tithing plan." Keating at 1050 n. 42. *See also In re Ivy*, 1988 WL 409629 (D.Or.1988), *aff'd* 920 F.2d 936 (9th Cir.1990), *cert. denied* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991).